## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: INCARE, LLC, | : | Chapter 7 |
| | : | |
| Debtor. | : | Bky. No. 13-14926 ELF |
| | : | |
| | : | |
| ROBERT H. HOLBER, Chapter 7 Trustee, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MEHDI NIKPARVAR, MD | : | |
| a/k/a Medhi Nikparvarfard, et al. | : | Adv. No. 14-0248 |
| | : | |
| Defendants. | : | |
| | : | |

# O P I N I O N

## I. INTRODUCTION

Incare, LLC ("Incare" or "the Debtor") was a medical care provider that provided

hospitalist services to various hospitals and medical facilities throughout central and eastern

Pennsylvania.  In this adversary proceeding, Robert H. Holber, the chapter 7 trustee ("the

Trustee"), seeks to avoid certain transfers made by the Debtor to various insider entities.  The

Trustee invokes the actual and constructive fraudulent transfer provisions of the Bankruptcy

Code, 11 U.S.C. §§544(b) and 550, and the Pennsylvania Uniform Fraudulent Transfer Act

("PUFTA"), 12 Pa. C.S. §§5104 and 5105.

Based on the evidence presented during a two (2) day bench trial, I find that the Trustee

cannot recover from the Defendants and I will enter judgment in the Defendants' favor.

-1-

## II. PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 11 on June 3, 2013. By Order dated July 25, 2013, the case was converted to chapter 7.

On May 27, 2014, the Trustee commenced this adversary proceeding by filing the Complaint against the following Defendants: Dr. Mehdi Nikparvar (the managing and sole member of Incare), his wife Niusha Houshmand, Merck Real Estate, LLC, the Nikparvar Family Trust and several urgent care entities related to Incare:

> Advanced Urgent Care of City Line, LLC
> Advanced Urgent Care of Feasterville, LLC
> Advanced Urgent Care of Franklin Market, LLC
> Advanced Urgent Care of Langhorne Square, LLC
> Advanced Care of Montgomeryville, LLC
> Advanced Urgent Care of Roosevelt Boulevard, LLC
> Advanced Urgent Care of Scranton, PC
> Advanced Urgent Care, P.C.
> Advanced Urgent Care of Willow Grove, LLC
> Advanced Urgent Care of Sinking Spring, LLC, and
> Advanced Urgent Care of Lawrenceville, LLC

(collectively, "the Urgent Care Entities").[1]

In the Complaint, the Trustee requested avoidance of certain transfers as fraudulent pursuant to 11 U.S.C. §544 and recovery under 11 U.S.C. §550.[2]

---

[1]    Dr. Nikparvar is the principal of all the Urgent Care Entities. Consequently, when I discuss the Defendants' legal position and arguments in this Opinion, I will ascribe them to Dr. Nikparvar.

[2]    The Complaint makes one (1) fleeting reference to 11 U.S.C. §548. Since then, and in particular, in the post-trial submissions, the Trustee has made no reference to §548; all of his arguments were based on §544(b)(1). In these circumstances, any claims under §548 have been waived. See Bearley v. Friendly Ice Cream Corp., 322 F. Supp.2d 563, 575 n.3 (M.D. Pa. 2004); In re Singh, 433 B.R. 139, 143 n.1 (Bankr. E.D. Pa. 2010); see also Ponzini v. PrimeCare Med., Inc., 269 F. Supp. 3d 444, 603 (M.D. Pa. 2017), appeal pending, No. 17-3133 (3d Cir.).

On October 14, 2015, the Trustee filed a motion for partial summary judgment to which

the Defendants responded on November 4, 2015.  I denied the Trustee's motion on April 6, 2016.

Thereafter, pre-trial proceedings were delayed by the retirement of the Trustee's attorney and his

retention of new counsel.

The trial was conducted on March 23 and 24, 2017.   The parties filed post-trial proposed

findings of fact and conclusions of law with supporting memorandum; the last of the submissions

was filed on August 9, 2017.

### III.  FINDINGS OF FACT

I make the following findings of fact based upon the testimonial and documentary

evidence presented at trial and the undisputed facts set forth in the parties' Joint Pretrial

Statement ("JPS").

### A.  The Parties

***Dr. Nikparvar***

1.   Dr. Medhi Nikparvar ("Dr. Nikparvar") is a physician who practices internal medicine.

   (Notes of Testimony, 3/24/17, at 5).[3]

2.   Dr. Nikparvar graduated medical school in Iran in 1995.  (2 N.T. at 5).

3.   Dr. Nikparvar came to the United States from Iran in 2000 and completed his residency in

   2004.  (Id.).

4.   Following the completion of his residency, Dr. Nikparvar worked as both an emergency

---

[3]        There were two (2) days of testimony: March 23 and 24, 2017. Hereafter, I will refer to
those hearings as "1 N.T. " and "2 N.T.," respectively.

room doctor and as a hospitalist.  (1 N.T. at 156-57).

*The Non-Debtor Entities*

5. Starting in 2009, Dr. Nikparvar formed at least fifteen (15) entities, including the eleven (11)

   non-Debtor Urgent Care Entities that are Defendants in this adversary proceeding, as well as

   Merck Real Estate LLC, Express Construction LLC, Express Medical Supply LLC, and

   Advanced Dentistry of City Line LLC. **(**JPS at 3; 1 N.T. at 162-64).

6. Every urgent care center was formed as a separate limited liability company and operated

   separately.  (1 N.T. at 161).

7. As of November 2014, seven (7) Advanced Urgent Care facilities were still active:

   (a) Advanced Urgent Care of City Line, LLC;

   (b) Advanced Urgent Care of Montgomery, LLC;

   (c) Advanced Urgent Care of Roosevelt Blvd., LLC;

   (d) Advanced Urgent Care of Scranton, PC;

   (e) Advanced Urgent Care of Willow Grove, LLC;

   (f) Advanced Urgent Care of Sinking Spring; and

   (g) Advanced Urgent Care, LLC (State College).

   (JPS at 3).

### B.  Incare

8. Dr. Nikparvar is the 100% owner of the Debtor, Incare. (JPS at 2; 1 N.T. at 59, 125; Ex.

14.).[4]

9.    Dr. Nikparvar formed Incare in 2004, along with Dr. Jeffrey Narmi. (1 N.T. at 155, 158; 2
N.T. at 6).

10.   Subsequently, Dr. Nikparvar became the sole owner of Incare (after Jeff Narmi resigned). (1
N.T. at 158; 2 N.T. at 6).

11.   For tax purposes, Incare's income passed through to Dr. Nikparvar.  (1 N.T. at 58-59).

12.   Incare provided hospitalist services to various hospitals in Ohio, Pennsylvania, and New
York, through which the hospitals outsourced to Incare the care of its in-patients. (1 N.T. at
156; 2 N.T. at 7-8).

13.   Incare had a contract with each hospital it serviced. (2 N.T. at 8, 10).

14.   Incare served as a "kind of manager" for each hospital, hiring and staffing the physicians,
providing hospitalist services, scheduling the doctors, obtaining malpractice insurance,
billing and collecting from patients.  (2 N.T. at 8-9).

15.   Incare engaged up to 40 physicians in its hospitalist staffing services, including Dr.
Nikparvar. (2 N.T. at 15).

16.   By the middle to end of 2010, due to changes in the reimbursement and insurance
environment, Dr. Nikparvar realized that Incare's business model could not be sustained and
needed to be changed. (2 N.T. at 89).

17.   As a result, Dr. Nikparvar decided to turn Incare into an urgent care provider instead of a

---

[4]        The Exhibits referred to are the Plaintiff's exhibits, unless specifically denoted as the
Defendant's ("Def's Ex.").

hospitalist service provider.  (2 N.T. at 89; 1 N.T. at 161).[5]

18.  Beginning in 2010, Incare opened, or attempted to open, five (5) free standing urgent care

facilities in New Jersey and Pennsylvania, spending considerable amounts of capital on

these new businesses.  (2 N.T. at 52-6).

19.  Incare was the owner as well as real estate lessee of these urgent care facilities. (2 N.T. at

56).

20.  Dr. Nikparvar and his wife provided personal guarantees for Incare's urgent care facilities.

(2 N.T. at 57-8).

21.  Dr. Nikparvar decided to have Incare be the owner of the stand alone urgent care LLCs (as

opposed to opening the facilities in his name) for two reasons:

>  (a)  the landlords insisted; and
>
>  (b)  Incare's revenues were declining and the urgent care industry presented a new
>  source of income.

(2 N.T. at 59-60).

22.  The locations in Feasterville and Levittown, Pennsylvania never opened.  (2 N.T. at 61-2).

23.  Incare was evicted from the facility space in Langhorne, Pennsylvania  (2 N.T. at 63).

24.  Urgent Care of Lawrenceville, in New Jersey, was financed by Incare, Dr. Nikparvar, and by

"other entities." It closed in 2011 or 2012. (2 N.T. at 54).

25.  Incare filed for chapter 11 bankruptcy on June 3, 2013.

26.  Incare's bankruptcy case was converted to chapter 7 on June 25, 2013.

---

[5]      The fact that Medicare and Medicaid stopped recognizing hospitalist services as a code
for billing contributed to Dr. Nikparvar's decision. (1 N.T. at 159-160).

## C.  Incare's Financial Status 2008-2012

*2008*

27.  At the end of 2008, Incare maintained $672,917.00 in cash on its books and the gross amount of Incare's depreciable assets at the end of 2008 was $4,000.00. (1 N.T. at 57; Ex. 14).

28.  Incare's liabilities at the end of 2008 totaled $29,935.00. (1 N.T. at 58; Ex. 14).

29.  Incare generated $3,705,525.00 in gross income and $399,483.00 in net taxable income in 2008, which was attributed as income to Dr. Nikparvar. (1 N.T. at 59, 125-126; Ex. 14).

30.  Incare was able to pay its bills in 2008 as they fell due.  (2 N.T. at 21).

*2009*

31.  On its 2009 federal income tax return, Incare reported that:

    a.  at the beginning of 2009, it had $672,917.00 in cash and at the end of the year it had $97,569.00 in cash. (1 N.T. at 60, 114; Ex. 13);

    b.  it valued its buildings and depreciable assets at $4,000.00 at the beginning of the year and $1,282,633.00 at the end of the year. (1 N.T. at 60-61; Ex. 13);

    c.  it generated income of $672,461.00 and made distributions of $681,570.00. (1 N.T. at 61; 2 N.T. at 30; Ex. 13).

32.  Incare was able to pay its bills in 2009.  (2 N.T. at 29-31).

*2010*

33.  On its 2010 federal income tax return, Incare reported that:

    a.  at the beginning of 2010, it had $97,569.00 in cash and at the end of the year it had $77,271.00 in cash; (1 N.T. at 151; Ex. 12);

      b.   its net or "book" income in 2010 was $244,515.00; however its income after deductions (essentially the net profit of the company) was $0.00; (1 N.T. at 151-2; Ex. 12);

      c.   it distributed $578,180.00 to Dr. Nikparvar as its sole owner and shareholder; (1 N.T. at 65-66; Ex. 12);

      d.   it valued its buildings and depreciable assets at $1,282,633.00 at the beginning of the year (before depreciation) and at $2,434,362.00 at the end of the year (after depreciation); (1 N.T. at 62; Ex. 12);[6]

      e.   at the beginning of the year, its liabilities included $325,000.00 for mortgage notes and bonds payable in less than one year and $179,136.00 in current liabilities for "payroll deductions;" (1 N.T. at 63; Ex. 12);

      f.   at the end of the year, its liabilities were  $1,998,191.00 for mortgages and equipment and $15,430.00 for "payroll deductions;" (1 N.T. at 63-64; Ex. 12).

34.   The mortgages for which Incare reported liability on its tax return in 2010 were liabilities incurred in the purchase of parcels of real property in South Carolina that Dr. Nikparvar owned personally.[7] (1 N.T. at 63-64, 94, 183; 2 N.T. at 52; Ex.12).[8]

35.   At the end of 2010, Medicare and Medicaid stopped recognizing Incare's hospitalist services and reduced payments to Incare.  (2 N.T. at 46-7, 49, 83).  Dr. Nikparvar became aware of

---

[6]     The increase in depreciable assets was due to improvements and renovations in lease holdings in certain locations, including BenBrooke, Levittown, Langhorne, and Feasterville. (1 N.T. at 195).

[7]     Three debts on Dr. Nikparvar's properties (those listed on Exhibits 33-35) are also listed as "Other Liabilities" on Incare's 2010 tax return. (1 N.T. at 113, 63-64, 94, 130; Ex.12). These were debts that were incurred by Incare for the use of the company. (1 N.T. at 130-131).

[8]     Incare paid these mortgages because Dr. Nikparvar invested (at least some) of the equity of his refinanced properties in Incare. (1 N.T. at 181, 183-4).  Dr. Nikparvar testified that these mortgage payments were his distribution in 2011 and 2012. (1 N.T. at 185; see also 2 N.T. at 52, 64-5).

this at the end of 2010 or in early 2011.  (Id. at 83).

36. Incare applied for a line of credit in 2010 but was denied. (1 N.T. at 196).

37. Incare was generally able to pay its debts as they fell due in 2010. (1 N.T. at 128-29; 192).[9]

38. In 2010, Incare made transfers to Advanced Urgent Care P.C. ("Advanced") totaling $1,779,191.51.  (See 2 N.T. at 77-78; Exs. 19 & 21).[10]

---

[9]     It may be more accurate to say that the Trustee failed to prove that Incare was not able to pay its debts as they fell due in 2010.  See Part V.A.1., infra.

[10]

| Date of Transfer from Incare to Advanced | Amount |
|---|---|
| May 3, 2010 | $253,697.77 |
| May 25, 2010 | $8,759.05 |
| May 27, 2010 | $483,886.90 |
| June 22, 2010 | $40,424.12 |
| June 29, 2010 | $129,599.19 |
| July 21, 2010 | $50,602.56 |
| August 3, 2010 | $329,228.42 |
| August 5, 2010 | $168,280.78 |
| August 23, 2010 | $29,712.79 |
| September 16, 2010 | $5,232.35 |
| October 12, 2010 | $13,422.76 |
| November 3, 2010 | $96,418.97 |
| December 16, 2010 | $169,925.85 |

39. In 2010, Advanced made transfers to Incare totaling $1,779,738.95.  (See 1 N.T. at 180; Exs.

19, 21).[11]


*2011*

40. In 2011, Incare experienced cash flow problems and was late in paying at least some of its

_____

[11]

| Date of Transfer from Advanced | Amount of Transfer to Incare |
| --- | --- |
| May 4, 2010 | $137,942.94 |
| May 20, 2010 | $67,753.20 |
| June 2, 2010 | $156,083.39 |
| June 15, 2010 | $75,046.88 |
| June 16, 2010 | $63,351.30 |
| July 6, 2010 | $85,924.71 |
| July 9, 2010 | $79,608.59 |
| August 17, 2010 | $410,677.58 |
| September 7, 2010 | $50,981.92 |
| September 13, 2010 | $56,395.94 |
| September 20, 2010 | $108,784.34 |
| September 27, 2010 | $129,511.97 |
| October 7, 2010 | $50,424.14 |
| October 14, 2010 | $40,907.23 |
| November 8, 2010 | $60,657.02 |
| November 16, 2010 | $35,761.95 |
| December 21, 2010 | $82,800.20 |
| December 24, 2010 | $68,771.95 |
| December 29, 2010 | $18,353.70 |

bills. (1 N.T. at 215).

41. As of the date of the trial, Incare had not yet filed its 2011 tax return. (1 N.T. at 216).

*2012*

42. In 2012, Incare continued to suffer cash flow problems and was late in paying at least some of its bills. (1 N.T. at 215).

43. Incare stopped "making money" in early 2012. (1 N.T. at 222).

### D.  Incare's Relationship with Dr. Nikparvar

44. In 2010, Dr. Nikparvar not only owned and managed Incare, but also provided services as a physician, working nearly every day and often working double shifts.  This meant that Dr. Nikparvar worked approximately four hundred (400) 12-hour shifts per year. (1 N.T. at 191, 193; 2 N.T. at 15).

*Dr. Nikparvar's contributions to Incare*

45. In 2006, Dr. Nikparvar made a $48,670.00 capital contribution to Incare. (2 N.T. at 19, 79; Def's Ex. 1).

46. In 2007, Dr. Nikparvar made a $129,844.00 capital contribution to Incare. (2 N.T. at 20; Def's Ex. 2).

47. In 2008, Dr. Nikparvar made a $536,950.00 capital contribution to Incare. (1 N.T. at 126; Ex. 14).

48. Between January 2010 and June 2012, Dr. Nikparvar and his wife transferred $657,000.00 to Incare. (1 N.T. at 89; Ex. 10 at Sub-Exhibit 14).

49. As Incare's income decreased, to cover its expenses Dr. Nikparvar began infusing cash into the business from personal funds including the proceeds of refinanced mortgage loans on his personally-owned real properties and from other urgent care businesses. (2 N.T. at 49-50, 61).

### *Distributions to Dr. Nikparvar from Incare*

50. In 2008, Incare distributed $820,747.00 to Dr. Nikparvar from Incare, reducing the capital account to $687,202.00. (1 N.T. at 59-60, 126-27; Ex. 14).

51. In 2009, Incare distributed $681,461.00 to Dr. Nikparvar.  (1 N.T. at 187-88, 190).

52. In 2010, Incare distributed $578,180.00 to Dr. Nikparvar. (1 N.T. at 190; Ex. 12).

### *Miscellaneous*

53. Dr. Nikparvar did not receive a W-2 tax form from Incare; nor did he have a physician's agreement with the company. (1 N.T. at 193-94).

54. All income and cash distributions received by Dr. Nikparvar during 2009 and 2010 are reflected on his personal income tax returns for each respective year. (1 N.T. at 191-92).

### E.  Dr. Nikparvar's Purchase of the South Carolina Rental Properties

55.  Dr. Nikparvar and his wife own five (5) vacation, investment-rental properties in South Carolina, acquired between December 2008 and April 2010 for a total cost of $3,450,000.00. (JPS at 2; 2 N.T. at 24-5, 31).

56. The five (5) properties are:

    a.   1018 South Waccamaw Drive, Greenville, SC;

  b. 1779 South Waccamaw Drive, Greenville, SC;

  c. 1856 South Waccamaw Drive, Garden City, SC;

  d. 999 Waccamaw Drive, Garden City, SC; and

  e. 1864 S. Waccamaw Drive, Garden City, SC.

(1 N.T. at 112, 2 N.T. at 25-6, 31-32, 38; Ex.38; Def's Ex. 3, 9, 10, 11, 12).

57. The first four (4) properties listed in Finding of Fact No. 56 were purchased in 2008 or 2009

  either with Dr. Nikparvar's personal funds or a combination of personal funds and Incare

  monies.

58. To the extent that Incare advanced money for the purchases, Dr. Nikparvar treated the

  advances as income on his personal tax returns.  (1 N.T. at 131-32; 2 N.T. at 34-35).


***1864 South Waccamaw Drive***

59. On April 29, 2010, Dr. Nikparvar purchased the 1864 S. Waccamaw Drive Property for

  $805,000.00.  (2 N.T. at 42-3; Ex. 26; Def's Ex. 8).

60. Dr. Nikparvar paid for the 1864 S. Waccamaw Drive Property as follows:

  a. $25,000.00 from Incare funds (treated as an Incare distribution to Dr. Nikparvar);

  b. $387,791.00 also from Incare funds (also treated as an Incare distribution to Dr.
   Nikparvar);

  c. $389,000.00 in funds derived from a refinancing of another property previously
   purchased.

(1 N.T. at 31-35, 49; 2 N.T. at 43-5; Exs.11, 26, 27, 28, 29, 32; Def's Ex. 8).[12]

---

[12] It is unclear from the record where the remaining $3,209 came from to pay for this property.

*Other Facts Regarding the South Carolina properties*

61. Dr. Nikparvar refinanced his South Carolina properties beginning in 2010 in order to finance changes in Incare's operations (from inpatient to outpatient). (2 N.T. at 84, 89).

62. Incare then made mortgage payments on the South Carolina properties, starting in July 2010 and continuing through 2011. (1 N.T. at 50-51; Ex. 22).

## F. Lawsuits against Incare and Dr. Nikparvar

*PPMRS*

63. Physician Practice Management and Reimbursement Specialists, Inc. ("PPMRS") served as the medical billing company for Incare from 2004 to 2010. (2 N.T. at 18).

64. On or about January 19, 2011, PPMRS filed a complaint against Incare in the Court of Common Pleas of Luzerne County (the "State Court Suit") for breach of contract, alleging that Incare failed to pay for billing services PPMRS provided to Incare. (1 N.T. at 167-69; Ex.41).

65. On March 29, 2012, PPMRS obtained a judgment on its claim against Incare in the State Court Suit in the amount of $384,963.15.  (1 N.T. at 171).

66. On November 12, 2013, PPMRS filed an unsecured claim in the Debtor's bankruptcy case in the amount of $376,943.22. (1 N.T. at 171; Ex.6).

*Dr. Madeira*

67. On November 12, 2012, Dr. Robert Madeira, a former employee of Incare, obtained a state court judgment against Incare in the amount of $90,890.42 (based on a breach of contract claim) (the "Madeira Judgment").  (1 N.T. at 186; Ex.3).

-14-

68. Dr. Madeira sued both Incare and Dr. Nikparvar individually. (2 N.T. at 69).

69. Dr. Madeira transferred the Madeira Judgment to South Carolina, after which Dr. Madeira
    was paid approximately $109,000.00. (2 N.T. at 69-71, 92).[13]

70. On August 26, 2013, Dr. Madeira filed an application for allowance of a wage priority claim
    in the amount of $12,475.00.


***Dr. Sanchez***

71. In 2010, Dr. Marcos Sanchez, another Incare employee, obtained a $400,000.00 default
    judgment against Incare (the "Sanchez Judgment"). (1 N.T. at 177).

72. Based on the Sanchez Judgment, Dr. Sanchez was able to freeze Incare's PNC bank account.
    (1 N.T. at 227-8).

73. In 2010, in response to the Sanchez Judgment, Incare succeeded in reversing the
    garnishment of Incare's bank account and in opening the Sanchez Judgment. (1 N.T. at 176-
    80).

74. Thereafter, Dr. Nikparvar transferred funds from Incare's PNC account to other entities he
    controlled, both to prevent Incare from being subject to another garnishment as a result of
    the Sanchez Judgment and to ensure that Incare could continue to operate. (1 N.T. at 178,
    180, 230, 232).[14]

---

[13]     A $40,000.00 dispute over attorney's fees remains between Dr. Madeira and Dr.
Nikparvar. (2 N.T. at 72).


[14]     Dr. Nikparvar testified that he transferred the money not to thwart Dr. Sanchez's
collection efforts,  but because he

(continued...)

75. On August 27, 2013, Dr. Sanchez filed an application for a wage priority claim in the
amount of $12,475.00.  (Ex.7; Def's Ex.18).

### IV. LEGAL STANDARDS

The Trustee bases his claim on 11 U.S.C. §544(b)(1).

Section 544(b)(1) provides that "the trustee may avoid any transfer of an interest of the
debtor in property or any obligation incurred by the debtor that is voidable under applicable law
by a creditor holding an unsecured claim that is allowable under section 502." Thus, the Trustee
is entitled to step into the shoes of an actual creditor who existed at the commencement of the
bankruptcy case, and avoid fraudulent transfers based on avoidance claims available to the
creditor under applicable nonbankruptcy law.  In this case, the applicable nonbankruptcy law is
PUFTA.

There is no dispute that the transfers at issue were of an interest in Incare's property.  The
parties also do not dispute that the relevant transfers occurred within four (4) years prior to
Incare's June 3, 2013 bankruptcy petition and that Incare had unsecured creditors at the time of
the petition who would have been able to avoid the transfers (if they are avoidable under
PUFTA). Therefore, if the Trustee can satisfy the remaining requirements of either the actual or
the constructive fraud provisions which apply under PUFTA, those respective transfers will be
avoidable.

---

[14](...continued)

> wanted to make sure that the doctors who are working in the hospital, at the end
> of the month, [were] paid for the services; otherwise, we would have a
> humanitarian disaster. All of those doctors they would walk out of the hospital
> and the patients who are there would not be able to be provided service until my
> attorney would be able to get a hold of the Judge . . . to open that judgment . . ."

(1 N.T. at 178).

## A.  Actual Fraud Under PUFTA

The actual fraud subsection of PUFTA, 12 Pa. C.S. §5104,  provides:

> (a) General rule – A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with the actual intent to hinder, delay or defraud any creditor of the debtor
> > .   .   .   .

12 Pa. C.S. §5104(a)(1).

Courts may infer a defendant's actual intent from circumstantial evidence, commonly referred to as "badges of fraud," because it is rare for a transferor to readily admit the transfer was motivated by an "actual intent" to defraud creditors. See, e.g., In re Polichuk, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014).  PUFTA employs a set of "badges" or indicia a court may consider when evaluating whether a transfer was motivated by actual fraud. Id; accord, Valley Bldg. & Const. Corp., 435 B.R. at 285- 286.[15]

---

[15]     As codified in PUFTA, section 5104(b), among other factors, consideration may be given to whether:

(1)     the transfer or obligation was to an insider;

(2)     the debtor retained possession or control of the property transferred after the transfer;

(3)     the transfer or obligation was disclosed or concealed;

(4)     before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     the transfer was of substantially all the debtor's assets;

(6)     the debtor absconded;

(7)     the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably

(continued...)

The Trustee bears the burden of proof under §5104(c).  In re Valley Bldg. & Const. Corp.

435 B.R. 276, 285- 286 (Bankr. E.D. Pa. 2010); In re Pennsylvania Gear Corp., 2008 WL

2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008).[16]


## B.  Constructive Fraud

For a constructive fraud claim, the relevant sections of PUFTA are 12 Pa. C.S.

§§5104(a)(2) and 5105.

Section 5104(a)(2) applies to creditors whose claims arose either before or after the

transfer and provides that the transfer for **less than reasonably equivalent value** is fraudulent if

the debtor:

> (i) was engaged or was about to engage in a business or a transaction for
> which the **remaining assets of the debtor were unreasonably small in
> relation to the business or transaction**; or

---

[15](...continued)

equivalent to the value of the asset transferred or the amount of the
obligation incurred;

**(9)**    ***the debtor was insolvent or became insolvent shortly after the transfer
was made or the obligation was incurred***;

**(10)**   ***the transfer occurred shortly before or shortly after a substantial debt
was incurred; and***

(11)   the debtor transferred the essential assets of the business to a lienor who
transferred the assets to an insider of the debtor.

12 Pa. C.S. §5104(b) (emphasis added).


[16]      In Pennsylvania Gear, the court observed that "[t]here is some dispute as to whether the
standard that must be satisfied for actual intent under federal or state fraudulent conveyance law is clear
and convincing or preponderance of the evidence," but found it unnecessary to resolve that issue because
the trustee failed to meet even the lower burden.  2008 WL 2370169, at *9.  The same is true in this
adversary proceeding.

> (ii) intended to incur, or believed or reasonably should have believed that the debtor **would incur, debts beyond the debtor's ability to pay as they became due**.

12 Pa. C.S. §5104 (emphasis added).

In contrast, §5105 applies only to creditors whose claims arose before the transfer and provides that a transfer is fraudulent

> if the debtor made the transfer or incurred the obligation **without receiving reasonably equivalent value** in exchange for the transfer or obligation and the debtor was **insolvent at that time or the debtor became insolvent** as a result of the transfer or obligation.

12 Pa. C.S. §5105 (emphasis added).

Section 5104(a)(2)(ii) applies only if the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Section 5105 applies only if the debtor "was insolvent at the time of the transfer or the debtor became insolvent as a result of the transfer." As explained in In re Dawley, 2005 WL 2077074, at *12 (Bankr. E.D. Pa. 2005), both of the PUFTA constructive fraudulent transfer provisions require a showing regarding the Debtor's financial situation.

Under the constructive fraud provisions of PUFTA, the party challenging the transfer bears the burden of proving all of the elements of a constructive fraudulent transfer claim by a preponderance of the evidence.  See In re Wettach, 811 F.3d 99, 107 (3d Cir. 2016).  However, in appropriate circumstances,  the court may employ a rebuttable presumption that the transfer lacked reasonably equivalent value and impose the burden of producing evidence of reasonably equivalent value on the defendant.  See id. at 108-09.[17]

---

[17]      Wettach involved a trustee's attempt to set aside the debtor's transfers of his wages into a joint bank account with his spouse.  The spouses' defense was that the use of the money for joint household expenses constituted reasonably equivalent value for the transfer, thus defeating the Trustee's

(continued...)

## V.  DISCUSSION

The Trustee claims that two categories of Incare transfers are avoidable under 11 U.S.C.

§544(b)(1):

(1) $578,180.00 in distributions that Incare made to Dr. Nikparvar in 2010 ("the 2010 Distribution"); and

(2) Three (3) transfers totaling $746,753.00 that Incare made to Advanced Urgent Care P.C. in May 2010 ("the Advanced Urgent Care Transfers").

The Trustee seeks avoidance of the 2010 Distribution on a constructive fraud theory and avoidance of the Advanced Urgent Care Transfers on an intentional fraud theory.

As explained below, the Trustee failed to prove that the 2010 Distribution was constructively fraudulent.

As for the Advanced Care Urgent Transfers, the Trustee proved that those transfers were

---

[17](...continued)
claim.  However, the bankruptcy court ruled for the trustee.  The district court affirmed, as did the Third Circuit.

The Court of Appeals, after holding that the Trustee had the burden of persuasion on all of the elements of the fraudulent transfer claim, went to great pains to distinguish between the burden of production and the burden of persuasion.  The court determined that the bankruptcy court imposed on the spouses the burden of producing some evidence regarding the use of the transferred funds.  According to the Third Circuit, the bankruptcy court concluded that the spouses failed to satisfy this burden of production, which then allowed the bankruptcy court to find that trustee had met his burden of persuasion and proven the absence of reasonably equivalent value.

The Court of Appeals described the bankruptcy court as having employed a rebuttable presumption that the funds were not transferred for a reasonably equivalent value, a presumption that would burst like a bubble and disappear upon the production of sufficient evidence to rebut the presumed fact.  But, at all times the burden of persuasion was on the Trustee.  Wettach, 811 F.3d at 108.  The court found no error with this approach.

The Wettach court observed that use of the rebuttable presumption serves as an "information-forcing" device where one party has superior access to the relevant information or there is a substantial probability that the presumed fact is true.  Id. at 108.

intentionally fraudulent; however, the Trustee was unable to establish his right to recover the

transfers under 11 U.S.C. §550.

## A. The 2010 Distribution

The Trustee breaks down the 2010 Distribution into two (2) components:

(1) the $412,791.40 that Dr. Nikparvar drew from the Incare account on April 30, 2010, which Dr. Nikparvar used to acquire 1864 S. Waccamaw Drive, (see Exs. 27, 29) ("the April 2010 Transfers"); and

(2) an additional $165,388.60 in distributions that Dr. Nikparvar received from Incare in 2010. (See Trustee's Memo at 3 (citing Ex. 12)).

## 1. presumption of insolvency

Insolvency is defined under PUFTA as follows:

> A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.

12 Pa. C.S. §5102(a).

PUFTA further provides that a debtor is "presumed" insolvent under PUFTA if the debtor

is not paying its debts as they become due.  If this presumption arises, the party against whom the

presumption is directed bears the burden of proving that the nonexistence of the insolvency is

more probable than its existence.  12 Pa. C.S. §5102(b).

The Trustee contends he is entitled to a presumption of Incare's insolvency.

The Trustee asserts that, as of April 30, 2010 (the date of the April 2010 Transfers),

Incare had an outstanding balance due to its medical billing provider, PPMRS, of $356,584.00.

Further, several Incare invoice payments to PPMRS were late in the period both immediately

preceding and after the April 2010 Transfers.  (Ex. 5).[18]  The Trustee also points to Incare's

failure to pay the IRS $137,105.09 in federal unemployment taxes over the course of 2010.  (See

Ex. 2).

Dr. Nikparvar denies that Incare was insolvent during 2010.   He testified that Incare

continued to pay its bills during that year.  (1 N.T. at 128-29; 192).[19]

The applicability of the insolvency presumption depends upon whether Incare failed to

pay its debts as they fell due in 2010.

The Uniform Law Comment to §5102 states:

> In determining whether a debtor is paying its debts generally as they become due, the
> court should look at more than the amount and due dates of the indebtedness. The
> court should also take into account **such factors as the number of the debtor's
> debts, the proportion of those debts not being paid, the duration of the**

---

[18]    The following table lists the relevant PPMRS invoices and dates of payment:

| Invoice Date | Date of Payment | Amount |
|---|---|---|
| March 10, 2010 | May 10, 2010 | $39,037.79 |
| April 10, 2010 | June 4, 2010 | $26,127.31 |
| May 10, 2010 | July 9, 2010 | $25,320.34 |

[19]    Dr. Nikparvar attributes the financial difficulties Incare experienced after the April 2010
Transfers to the changes in the regulatory and reimbursement environment that rendered Incare's
business model unsustainable.  He contends that to resolve this problem, he sought to shift focus from
hospitalist services to urgent care services.  This change further necessitated capital investments (e.g., the
establishment of new facilities) that exacerbated Incare's cash flow issues.  To address the cash flow
difficulties, Dr. Nikparvar mortgaged his rental properties and loaned Incare $1,203,453.00.  (Ex. 12).  In
addition to the loan, Dr. Nikparvar personally injected approximately another $800,000.00 into Incare in
2011 and 2012 and did not take a salary or draw from Incare during those two years. Dr. Nikparvar
maintains that as a result of these cash infusions, Incare was able to meet and pay its operating costs as
they came due in 2010.

**nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments**. The court's determination may be affected by a consideration of the debtor's payment practices prior to the period of alleged nonpayment and the payment practices of the trade or industry in which the debtor is engaged.

(emphasis added).

The Comment to §5102 also cites favorably case law under the Bankruptcy Code, 11 U.S.C. §303(h)(1), governing contested involuntary bankruptcy proceedings, and which also employs the phrase "generally not paying debts . . . as they become due."[20]

In this case, I find the evidence insufficient to give rise to the §5102(b) insolvency presumption.

Dr. Nikparvar testified, albeit self-servingly, that in 2010 Incare was generally paying its debts as they fell due. He plausibly ascribed the substantial delinquency on the PPMRS account to a business dispute. That testimony is supported by the evidence of several regular, periodic (albeit modestly late) payments on invoices made to PPMRS in 2010. See n.18, supra.

---

[20]    My research reveals no Pennsylvania case law construing the PUFTA phrase "generally not paying debts . . . as they become due." Under the Bankruptcy Code, the phrase is undefined and courts have exercised broad discretion in construing and applying the phrase in particular cases, employing a "totality of the circumstances approach," see In re Brooklyn Resource Recovery, Inc., 216 B.R. 470, 481 (Bankr. E.D.N.Y. 1997), based on the consideration of factors similar to those described in the Uniform Law Comment to 12 Pa. C.S. §5102. Compare In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc., 779 F.2d 471, 475 (9th Cir.1985) with In re VitaminSpice, 472 B.R. 282, 297 (Bankr. E.D. Pa. 2012).

In VitaminSpice the court identified the follow factors to be considered:

- the number of debts,
- the amount of delinquency,
- the materiality of nonpayment,
- and the nature of the debtor's conduct of its financial affairs.

472 B.R. at 297.

There is some contrary evidence in the record.  In particular, the substantial shortfall in Incare's payment of its IRS employment tax liability creates some basis for doubting Dr. Nikparvar's sanguine description of Incare's financial situation in 2010.

The existence of the PPMRS and IRS liabilities, while probative, does not, standing alone, establish that Incare was not generally paying its debts as they fell due in 2010.  The Trustee did not generate a record that would provide an overview of Incare's financial affairs in 2010 and permit the PPMRS and IRS debts to be placed in their appropriate context.  The record does not reveal the total number of Incare's ongoing accounts, the amount of liabilities generated on a periodic basis by those accounts, the invoiced amounts that were being paid timely, the amounts that were not being paid timely or the duration of the nonpayment for those accounts that were delinquent.

In short, the record is just too thin and lacking in detail to permit the conclusion that Incare generally was not paying its debts as they fell due in 2010.  Consequently, I will not apply the 12 Pa. C.S. §5102(b) presumption of insolvency.

## 2.  proof of insolvency absent the presumption

Even without the insolvency presumption, the Trustee contends that the April 2010 Transfers rendered Incare insolvent.

The Trustee depicts Incare as experiencing significant financial problems in the months following the April 2010 transfers.  Incare was unable to fund its operations and was denied its application for a line of credit.  To keep the company running, Dr. Nikparvar was then forced to

infuse cash in to Incare by making a series of loans secured by his South Carolina properties.[21]

In response, Dr. Nikparvar points to the balance sheet attached to Incare's 2010 tax returns as proof of its balance sheet solvency.

The Trustee counters that the tax returns are not complete because they report income on a cash basis, which means all balance sheets included on the tax return do not incorporate accrued liabilities and, thus, are not a reliable indicator of solvency.  Accordingly, the Trustee contends that Incare did not produce any reliable evidence to establish  it was solvent, and therefore has not overcome the presumption.

Again, the outcome is determined by the burden of proof.

While the Trustee's criticism of the strength of the tax return as probative evidence is well taken, the document is nonetheless the only evidence in the record regarding Incare's balance sheet position in 2010.  In the absence of additional evidence of Incare's insolvency within the meaning of 12 Pa. C.S. §5102(a), I find that the Trustee failed to meet his burden of proof on the issue.

### 3.  reasonably equivalent value

In the interest of providing a comprehensive ruling, and as an alternative ground for my

---

[21]      The precise nature of the Trustee's alternative argument is not clear.  The Trustee did not quantify, with a balance sheet analysis, how the April 2010 transfers rendered Incare insolvent within the meaning of 12 Pa. C.S. §5102(a).  I interpret the Trustee's argument to be that the transfer caused Incare to be unable to pay its debts as they fell due, thereby creating a presumption under 12 Pa. C.S. §5102(b) that the transfer rendered Incare insolvent.  But I fail to see how the denial of a credit application or the infusion of cash through the mortgaging of properties owned by the Debtor's principal establishes that Incare was not timely paying its debts.

decision, I will address the question whether the 2010 Distribution was made for "reasonably equivalent value."

The Third Circuit Court of Appeals instructs that a two-step process is employed to determine whether a debtor received reasonably equivalent value in the form of indirect economic benefits in a particular transaction. The court should consider:

> (1) whether any value is received, and

> (2) whether the value was reasonably equivalent to the transfer made.

In re R.M.L., 92 F.3d 139, 152 (3d Cir. 1996); see also In re Fid. Bond & Mortg., 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006), aff'd, 371 B.R. 708 (E.D. Pa. 2007).

Because the purpose of PUFTA is to protect creditors, the court must consider whether value was received from the vantage of the creditor. Fid. Bond & Mortg., 340 B.R. at 286. The inquiry is "what did the debtor give up and what did it receive that could benefit creditors." Id. (citing In re Joy Recovery Tech. Corp., 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002)).

In this determination, "value ... include[s] any benefit ... whether direct or indirect." In re Fruehauf Trailer Corp., 444 F.3d 203, 212 (3d Cir. 2006) (citation omitted); Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646–47 (3d Cir. 1991).

The "touchstone" in the determination is whether the parties exchanged comparable "realizable commercial value." Mellon Bank, 945 F.2d at 647. Thus, if a debtor's "realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." Id.

Courts look to the totality of the circumstances, considering such factors as "fair market value compared to the actual price paid, the arm's-length nature of the transaction, and the good

faith of the transferee." Fid. Bond & Mortg., 340 B.R. at 287 (citing R.M.L., 92 F.3d at 145, 153). If a court concludes that the benefits the debtor received "are minimal and certainly not equivalent to the value of a substantial outlay of assets," a plaintiff need not prove the exact value conferred because the "amount" of value is then rendered irrelevant. Fruehauf Trailer Corp., 444 F.3d at 214.

 Dr. Nikparvar points to the services he provided to Incare as the reasonably equivalent value for the $578,180.00 that he received from Incare in 2010.

Dr. Nikparvar reportedly worked nearly every day in 2010, often doing double shifts - from 8:00 a.m. to 8:00 p.m. in his own hospital and then from 8:00 p.m. to 8:00 a.m. at a second hospital.  (2 N.T. at 16).  This equates to approximately four hundred (400) 12-hour shifts per year.  Each shift generated $1,200.00 in revenue, a total of approximately $480,000.00.  (1 N.T. at 193).  In addition, Dr. Nikparvar provided services to Incare in his capacity as its chief operating officer.

Once again, the issue presented is accompanied by a meager evidentiary record.

I credit Dr. Nikparvar's testimony that he personally labored extraordinarily hard in his professional capacity as a physician to generate a substantial amount of revenue for Incare.  He also managed a company that employed as many as forty (40) other physicians who provided health care services to hospitals through the hospitals' contracts with Incare, thereby providing substantial revenue to Incare.

Was the value of Dr. Nikparvar's services to Incare (and therefore, to Incare's creditors) worth the $578,180.00 that he drew in compensation in 2010?  On this record, it is hard to say.

-27-

On one hand, it would not be difficult to conclude, in the abstract, that an annual compensation of $578,180.00 for a physician who worked long hours, generated a substantial amount of revenue and undertook significant management responsibilities provided reasonably equivalent value to Incare. However, that common sense inference must be tempered by recognizing that Dr. Nikparvar's relationship to Incare was not that of a conventional employee being paid W-2 wages based on an arms-length relationship. Dr. Nikparvar took his compensation as an owner's draw (and not straightforward W-2 compensation).[22]

In the end, without a more detailed analysis of Incare's financial status and performance in 2010, it is difficult to draw any conclusion on the issue of reasonably equivalent value. Further, I find that the level of Dr. Nikparvar's compensation in 2010 was not so extreme that, by itself, it creates a presumption or makes out a prima facie case that the amount transferred was not reasonably equivalent to the value that Dr. Nikparvar provided to Incare. Therefore, I find that the Trustee did not meet his burden of proving by a preponderance of the evidence the absence of reasonably equivalent value.

---

[22]     Dr. Nikparvar testified about his accounting practices. In some respects, he treated Incare accounts as his personal bank accounts, at times drawing funds to pay his own expenses. But to be fair, Dr. Nikparvar did try to account for his compensation. At the end of each year, he provided his accountant with the record of these transactions and acknowledged them as income on his personal income tax returns. Nothing in the record suggests that Dr. Nikparvar attempted to conceal his compensation or evade paying personal income taxes. The point here, though, is that Incare did not treat Dr. Nikparvar as an employee.

## B.  The Advanced Urgent Care Transfers

### 1. the transfers

Between May and December 2010, Incare made thirteen (13) cash transfers to Advanced for no apparent consideration.  See n.10, supra & accompanying text.  For some unexplained reason, the Trustee focuses on only three (3) of those transfers – those made on May 3, 25 and 27, 2010, totaling $746,753.00 – and asserts that these particular transfers are avoidable as intentionally fraudulent transfers.  See 12 Pa. C.S. §5104(a)(1).

I find it impossible to analyze Advanced's potential liability by looking in isolation at only three (3) of the thirteen (13) transfers.  Rather, I will consider the effect of all thirteen (13) transfers.  Having done so, I conclude that although the transfers were made with an intent to hinder and delay a creditor and are avoidable under 11 U.S.C. §544(b), the Trustee may not recover under 11 U.S.C. §550.

### 2. the intent to hinder and delay

The transfers to Advanced all occurred after an Incare judgment creditor, Dr. Sanchez, attached and froze Incare's bank account.  Though Incare succeeded in obtaining the release of the bank account attachment, Dr. Nikparvar admitted in his testimony that he caused Incare to transfer funds to Advanced to prevent Dr. Sanchez from again attaching Incare's bank account. Based on this admission, I find this evidence establishes that the transfers were made with the intent to hinder and delay Dr. Sanchez within the meaning of 12 Pa. C.S. §5104(a)(1); see also In re Blatstein, 192 F.3d 88, 97–98 (3d Cir. 1999).

-29-

### 3. the effect of the Advanced return transfers to Incare

The far more difficult issue is the effect, if any, of the transfers back to Incare from Advanced.

The record reflects that in the May-December 2010 time frame, money was being transferred back and forth between Incare and Advanced on a regular basis. The thirteen (13) transfers from Incare to Advanced were matched by nineteen (19) transfers from Advanced to Incare.  In total, Incare transferred $1,779,191.51 to Advanced and Advanced transferred $1,779,738.95 back to Incare.  Advanced returned all of the money that Incare transferred to Advanced.. See nn.10-11, supra & accompanying text.

In Polichuk I reasoned that, given that the purpose of the fraudulent transfer provision of the Bankruptcy Code is to preserve the assets of the estate for the benefit of creditors, "if the debtor has received the property back, the debtor's estate has not been diminished, creditors have not been prejudiced and there is no reason for the trustee to invoke the avoidance power."  506 B.R. at 435.  As a result, I held that "a fraudulent transfer, otherwise avoidable under § 544(b) and PUFTA may not be avoided if the debtor received the transferred property back from the transferee prior to the commencement of the bankruptcy case."  Id. at 436; see also In re Meinhardt Mech. Serv. Co., Inc., 72 B.R. 548, 552 (Bankr. W.D. Pa. 1987) (same holding under prior law, Pennsylvania Fraudulent Conveyance Act).

The Trustee seeks to distinguish Polichuk, implying that its holding should be limited to cases involving constructive fraud, not actual fraud.

The Trustee's position is not unreasonable.  There is a significant difference between a constructive fraudulent transfer made without any intent to hinder, delay or defraud and an

intentionally fraudulent transfer. To permit a party to escape the consequences of an
intentionally fraudulent transfer by the simple act of later reversing the transaction creates
something akin to a moral hazard,[23] which is exacerbated if the party reaped some benefit from
the wrongful conduct before undoing the action. As discussed in Polichuk, in the context of
bankruptcy dischargeability, some courts have held that a debtor who reverses a fraudulent
transfer is still subject to the denial of his or her discharge, although there is contrary authority in
the context of fraudulent transfers. See Polichuk, 506 B.R. at 433–35 (citing cases).

Despite the concerns expressed above, I conclude that the facts in this case warrant the
application the "diminution of the estate" limitation on the §544(b) avoidance remedy, as
expressed in Polichuk. Specifically, I conclude that an equitable adjustment under 11 U.S.C.
§550 precludes the Trustee's recovery.

My reasoning, in reaching this outcome, involves several steps.

First, I acknowledge that the Advanced Urgent Care Transfers are avoidable under 11
U.S.C. §544(b), via 12 Pa. C.S. §5104(a).

Under PUFTA §5104(a)(1), a transfer is avoidable if made with the requisite intent to
hinder, delay or defraud a creditor  –  pure and simple. The payment of reasonably equivalent
value becomes relevant only as an affirmative defense under 12 Pa. C.S. §5108(a), which states:

> A transfer or obligation is not voidable under section 5104(a)(1) (relating to
> transfer or obligation voidable as to present or future creditor) against a person

---

[23]    The term "moral hazard" often refers to the act of taking risks knowing that someone
else will suffer the consequences if the conduct results in harm. Here, I use the term in the more general
sense that it is inappropriate to create an incentive for a person to ignore the moral implications of his or
her actions.

that took in good faith and for a reasonably equivalent value given the debtor or
against any subsequent transferee or obligee.

See also 12 Pa. C.S. §5108(f)(1) (party invoking §5108(a) has the burden of proof); Image
Masters, Inc. v. Chase Home Fin., 489 B.R. 375, 390–91 (E.D. Pa. 2013).

Thus, §5108 provides a defense to a transferee who enters into a transaction in which the
transferor is acting with an actual intent to hinder, delay or defraud its creditors, but the
transferee is innocent of any fraudulent intent.  But the §5108 defense to an intentionally
fraudulent transfer requires proof of two (2) elements: reasonably equivalent value **and** good
faith.

In this case, while Advanced's return of the transferred funds might satisfy the reasonably
equivalent value requirement of §5108(a), it cannot satisfy the good faith requirement.

At its most basic level, the good faith defense component of the §5108(a) defense is a
factual determination that requires that the transferee acted without fraudulent intent and did not
collude with the debtor or otherwise actively participate in the fraudulent transfer scheme.
Carroll v. Stettler, 2012 WL 3279213, at *3 n.10 (E.D. Pa. Aug. 10, 2012); Schwartzman v.
Hutchison, 2011 WL 4471059, at *4 (E.D. Pa. Sept. 27, 2011); Ameriserv Fin. Bank v. Commerce
Bank, N.A., 2009 WL 890583, at *4 n.8 (W.D. Pa. Mar. 26, 2009); In re Atomica Design Group,
Inc., 556 B.R. 125, 173 (Bankr. E.D. Pa. 2016). Further, while knowledge of a debtor's
insolvency prior to the transfer, by itself, does not establish a lack of good faith, that fact in
combination with other facts may establish a lack of good faith.  Courts must "examine what the
transferee objectively 'knew or should have known,' such that a transferee does not act in good
faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the

-32-

transfer." In re Burry, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004); see also In re Lockwood Auto

Group, Inc., 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010) (once a transferee is on notice of

suspicious circumstances regarding a transfer, failure to conduct a diligent investigation can be

fatal to a good faith defense).

In this case, the analysis is straightforward. Both the transferor (Incare) and the transferee

(Advanced) were controlled by the same principal, Dr. Nikparvar, who has admitted his

fraudulent intent. That intent must be imputed to both Incare and Advanced. See, e.g., Rochez

Brothers, Inc. v. Rhoades, 527 F.2d 880, 884 (3d Cir. 1975); In re Coopers & Lybrand, 900 F.

Supp. 784, 786 (W.D. Pa. 1995); Gordon v. Cont'l Cas. Co., 181 A. 574, 578 (Pa. 1935). Thus,

even though Advanced may have provided Incare with the functional equivalent of reasonably

equivalent value, Advanced was not acting in good faith and it cannot succeed on a PUFTA

§5108 defense to a claim under PUFTA §5104(a)(1).[24] The result is that the Trustee's 11 U.S.C.

§544(b) claim, based on PUFTA §5104(a)(1) is meritorious.

In short, in the context of an intentionally fraudulent transfer of assets that are later

returned to the transferor by the transferee, 12 Pa. C.S. §5108(a) does not insulate the transferee

from liability under 11 U.S.C. §544(b) (through PUFTA 12 Pa. C.S. §5104(a)(1)), unless the

transferee took the transfer in good faith. Because that good faith is lacking here, Advanced's

---

[24]     The outcome would be no different even if Dr. Sanchez, the actual target of the
intentionally fraudulent transfer, had been paid in full and was no longer a creditor at the time of Incare's
bankruptcy filing.

        PUFTA §5104(a)(1) provides a cause of action to a creditor, regardless of "whether the
creditor's claim arose before or after the [actually fraudulent] transfer was made" if the transfer was made
to defraud "any creditor" of the debtor. Thus, PUFTA §5104(a)(1) provides a remedy to any creditor
based on a fraudulent intent to hinder or delay any other creditor.

return of the transferred property is insufficient as a defense to avoidance of those transfers. The

Trustee has established all of the elements of his claim and the three (3) Advanced Urgent Care

Transfers are avoidable.

However, I must next apply 11 U.S.C. §550(a) because the power to avoid a transfer is

not the same thing as the power to recover. See, e.g., Crescent Res. Litig. Tr. ex rel. Bensimon v.

Duke Energy Corp., 500 B.R. 464, 481–82 (W.D. Tex. 2013) (citing cases).[25]

11 U.S.C. §550(a) provides, in pertinent part, that to the extent that a transfer is avoided

under §544, "the trustee may recover, for the benefit of the estate, the property transferred, or, if

the court so orders, the value of such property, from . . . the initial transferee of such transfer or

the entity for whose benefit such transfer was made."

Under §550, courts have limited the recovery of pre-petition transfers on equitable

principles in a manner consistent with the purposes of the Bankruptcy Code and §550, in

particular. See, e.g., In re Sawren, 359 B.R. 348, 353 (Bankr. S.D. Fla. 2007) (citing cases). For

a concise discussion of the rationales for limiting recovery under 11 U.S.C. §550 based on

equitable principles, see Robert B. Bruner and Gerard G. Pecht, The Unexplored Limits of

Moore v. Bay: Statutory and Equitable Basis for Limiting Money Damage Awards on Fraudulent

Transfer Claims, 26 J. Bankr. L. & Prac. NL Art. 2 (June 2017).

---

[25]      PUFTA has its own provision addressing a creditor's recovery rights after establishing
the avoidability of a transfer. 12 Pa. C.S. §5108(c) provides that a judgment based on an avoided transfer
should be entered for value of the property at the time of the transfer, "subject to adjustment as the
equities may require." Potentially, the equities in this case might justify a downward adjustment of the
judgment if the transferee has returned some or all of the transferred property back to the transferor.
However, 12 Pa. C.S. §5108(c) is inapplicable in this action. This is a proceeding under the Bankruptcy
Code, 11 U.S.C. §544(b). The remedy for recovery under §544(b) is found in 11 U.S.C. §550, not state
law.

More pertinent to this case, courts have recognized that in light of the remedial (not penal) purpose of transfer avoidance under the Bankruptcy Code, the bankruptcy court may reduce or eliminate a trustee's recovery under §550 where some or all of the transferred property was returned to the debtor pre-petition. In re Kingsley, 518 F.3d 874, 877-78 (11th Cir. 2008); In re Tronox, Inc., 464 B.R. 606, 618 (Bankr. S.D.N.Y. 2012); ASARCO LLC v. Americas Mining Corp., 396 B.R. 278 (S.D. Tex. 2008); see also In re Jackson, 318 B.R. 5, 27–28 (Bankr. D.N.H. 2004), aff'd, 459 F.3d 117 (1st Cir. 2006).[26]

The Eleventh Circuit's decision in Kingsley is directly on point.  In that case, the court affirmed the bankruptcy court's decision to give the transferee a credit for payments the transferee made to the debtor's creditors, even though the court found the debtor's transfer to the transferee was an intentional fraudulent transfer.  Kingsley, 517 F.3d at 877-78.

In this case, I consider it appropriate to give Advanced an equitable credit for the money it returned to Incare.

The Trustee's action is a Code-based collective remedy on behalf of all creditors.  It is difficult to discern how the creditor body, as a whole, was harmed by Incare's transfers to Advanced in 2010 – all of which were effectively reversed within the year – except to the extent that preferential payments may have been made, a harm for which the Code provides a separate remedy (11 U.S.C. §547).  In the absence of any such loss to the creditor constituency as a whole, permitting the Trustee to recover under 11 U.S.C. §550 would result in a windfall to the estate, not supported by bankruptcy policy. Thus, I find it appropriate to apply the principle enunciated

---

[26]    In Jackson, a proceeding brought under 11 U.S.C. §544(b), the bankruptcy court made the equitable adjustment to the trustee's recovery based on authority in the New Hampshire fraudulent transfer statute, rather than 11 U.S.C. §550.

in <u>Polichuk</u>, even though the transfer here is an intentional rather than a constructive fraudulent

transfer.

Consequently, where there was no diminution of Incare's assets as a result of the

Advanced Urgent Care Transfers, the Trustee is not entitled to recover under 11 U.S.C. §550(a).


## VI.   CONCLUSION

For the reasons set forth above, judgment will be entered in favor of the Defendants.


Date: __May 7, 2018__                 _____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**